# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>YELLOWSTONE CAPITAL LLC, a New York limited liability company,<br><br>FUNDRY LLC, a New York limited liability company,<br><br>YITZHAK D. STERN, a/k/a Isaac Stern, individually and as an officer of Yellowstone Capital LLC and Fundry LLC, and<br><br>JEFFREY REECE, individually and as an officer of Yellowstone Capital LLC and Fundry LLC,<br><br>    Defendants. | **Case No. 20-cv-6023**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with their business financing activities.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANTS

6. Defendant **Yellowstone Capital LLC** ("Yellowstone") is a New York limited liability company with its principal place of business at 1 Evertrust Plaza, Jersey City, New Jersey 07302. Until at least March 2016, its principal place of business was 160 Pearl Street, New York, New York 10005, and it continues to use business addresses located in this District in connection with acts and practices alleged below. Yellowstone transacts or has transacted business in this District and throughout the United States. At times material to this Complaint, acting alone or in concert with others, Yellowstone has advertised, marketed, offered, or distributed financing to businesses throughout the United States.

7. Defendant **Fundry LLC** ("Fundry") is a New York limited liability company with its principal place of business at 1 Evertrust Plaza, Jersey City, New Jersey 07302. Until at least March 2016, its principal place of business was 160 Pearl Street, New York, New York 10005. Fundry transacts or has transacted business in this District and throughout the United

States.  At times material to this Complaint, acting alone or in concert with others, Fundry has advertised, marketed, offered, or distributed financing to businesses throughout the United States.

8.      Defendant **Yitzhak D. Stern**, also known as Isaac Stern ("Stern"), is a founder and the Chief Executive Officer of both Yellowstone and Fundry.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Stern, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9.      Defendant **Jeffrey Reece** ("Reece") is the President of both Yellowstone and Fundry.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Reece, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

10.      Defendants Yellowstone and Fundry (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices alleged below.  Corporate Defendants have conducted the business practices described below through interrelated companies that have common officers, managers, business functions, employees, and office locations.  Because these Corporate Defendants have operated as a common enterprise, they are partners in concerted wrongdoing and liable for the acts and practices alleged below.  Defendants Stern and Reece have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that

constitute the common enterprise and are partners in the concerted wrongdoing of the common enterprise.

## COMMERCE

11.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview

12.     Since at least 2015, Defendants have advertised, marketed, and offered short-term, high-cost financing products to small business consumers in immediate need of funds. Defendants tout these products – often referred to as "merchant cash advances" ("MCAs") – as a quick source of funds for consumers that do not qualify for bank loans or other traditional forms of financing.  Defendants characterize their products as discounted purchases of consumers' future receivables to be repaid in a larger amount via daily installment payments purportedly based on a percentage of consumers' incoming business receipts.

13.     Defendants often advertise, market, and offer their MCAs through a vast, ever-changing network of agents.  Some of these agents include, but are not limited to, Green Capital Funding LLC, West Coast Business Capital, LLC, World Global Capital LLC, High Speed Capital LLC, Thryve Capital Funding LLC, and Mason Capital LLC.

14.     Defendants engage in a pattern of deceptive and unfair conduct in connection with the marketing, advertising, and offering of their MCAs.  They have misrepresented key aspects of their products, including their requirements that consumers provide collateral and personal guarantees, as well as the specific financing amount they will disburse to consumers.

4

Additionally, the Defendants have made excess, unauthorized withdrawals from consumers'
accounts after consumers already repaid the full amount that they owed.

<u>**Misrepresentations Regarding Collateral<br>and Personal Guarantees**</u>

15.     Since at least 2015, Defendants have disseminated advertisements that claim that
their MCAs do not require collateral or a personal guarantee.

16.     For example, Defendants have disseminated numerous online advertisements, on
websites including www.yellowstonecap.com, www.m.yellowstonecap.com,
www.smallbusinessfunders.com, www.sbfcash.com, and www.3hourfunding.com, that make the
following statements:

    a.   "We say yes to more small businesses, regardless of collateral" (**Exhibit A**);

    b.   "No collateral loans" & "We won't ask for any kind of collateral" (**Exhibit B**);

    c.   "No collateral, no personal guarantee" (**Exhibit C**);

    d.   "No collateral required" (**Exhibit D**);

    e.   "No Collateral Requirements" (**Exhibit E**);

    f.   "No Personal Guarantee Loans" & "We Provide Capital With No Personal
        Guarantee" (**Exhibit F**); and

    g.   "No Collateral Loans" (**Exhibit G**).

17.     Defendants' video advertisements also represent that Defendants do not require
collateral or personal guarantees.  For example, one of Defendants' video advertisements,
attached as **Exhibit H**, makes the following prominent claims:



As this image is displayed, an audio voiceover makes the following representations:  "No collateral required.  No collateral, no personal guarantee."

18.     Defendants have also disseminated direct mail pieces that represent that they do not require personal guarantees.  For example, one such direct mail piece, attached as **Exhibit I**, states: "You do not need excellent credit, or give us a personal guarantee."

19.     In reality, in many instances, Defendants do require business owners to sign a guarantee holding them personally responsible for the entire funded amount should the business default.  Additionally, in many instances, Defendants do require that consumers provide collateral, by granting Defendants a purported security interest or lien in all business property consumers own, including all financial accounts, equipment, inventory and other assets.

20.     When consumers default on their financing agreements, Defendants frequently file lawsuits against them, including against the individual business owners who provided the personal guarantees, in order to collect the unpaid funded amount.  Additionally, in many instances, as part of these lawsuits, the Defendants seek court orders to seize the collateral that

consumers have pledged.  Defendants Stern and Reece have closely overseen and directed

Defendants' day-to-day advertising and marketing efforts.  Among other things, they have

directly managed the work of Defendants' marketing agents.  They have also frequently

reviewed and provided feedback and approval for advertising content and claims.  In fact,

Defendants Stern and Reece have specifically reviewed copies of advertisements that claim the

Defendants do not require collateral.

### Misrepresentations Regarding Financing Amount

21.     Defendants promote that they provide immediate financing in a specific amount

in exchange for consumers' agreement to repay a higher amount out of consumers' future

business revenues.  Consumers remit the repayment amount over a period of months through

daily debits from their bank accounts in installment amounts purportedly corresponding to an

estimated percentage of each day's receipts.

22.     Since at least early 2015 until at least October 2018, the first page of Defendants'

contracts has prominently set forth the "Purchase Price" (the total dollar amount to be provided

to the consumer), the "Specified Percentage" (the percentage of daily revenues used to calculate

daily installment payments to Defendants), and the "Purchased Amount" (the total amount to be

repaid from future receivables).

23.     For example, in an agreement to provide $10,000 in financing, the first page of

the contract provides as follows:

| PURCHASE PRICE: | SPECIFIED PERCENTAGE: | PURCHASED AMOUNT: |
|---|---|---|
| $10,000 | 25% | $14,000 |

24.     In this example, Defendants purportedly agree to provide $10,000 in funding, and

the consumer agrees to repay a total of $14,000 via daily withdrawals from the consumer's bank

account.  The amount of those daily withdrawals is purportedly set at 25% of the consumer's daily receipts.  A redacted example of Defendants' entire financing agreement is attached to this complaint as **Exhibit J**.

25.     In reality, however, Defendants routinely provide consumers with substantially less than the total amount promised on the first page of the contract, by withholding fees that range from hundreds to thousands of dollars prior to disbursement.  These fees are mentioned several pages into the contract without any indication that they are deducted from the "Purchase Price" – the funds promised to consumers.  As a result, consumers, in numerous instances, have received significantly less funding than they were promised.

26.     In numerous instances, Defendants Stern and Reece have received messages detailing the difference between the funding amount promised to specific consumers in Defendants' contracts and the significantly lower amount disbursed to those same consumers after additional fees were withheld.

27.     To the extent Defendants reveal the actual funding amount consumers will receive, they sometimes do so in a brief telephone call only *after* consumers have signed their contracts.  In some instances, consumers express confusion and surprise when they learn that they will receive significantly less funding than they were promised in their contracts.  For example, when one consumer learned that she would receive roughly $4,000 less than her contract stated, she responded, "I think something is wrong," and "you guys are like highway robbery."

### Unauthorized Withdrawals

28.     Defendants require consumers to provide authorization for Defendants to withdraw daily payments – typically hundreds of dollars each day – from customers' accounts

using ACH debits until customers have fully repaid the "Purchased Amount" they owe under their agreements.

29.     Since at least 2015, Defendants have withdrawn money from customers' accounts in excess of the amounts customers authorized, by continuing to withdraw daily payments from customers after they have already fully repaid the "Purchased Amount." These unauthorized overpayments have been a typical occurrence for Defendants' customers, and have impacted at least thousands of them, in amounts ranging from hundreds to thousands of dollars.

30.     Defendants have acknowledged that they take these overpayments from customers knowingly. Specifically, Defendants' payment and recordkeeping processes create a "lag" or "debit delay" that results in them collecting an additional 4-5 or more unauthorized payments after customers have already fully repaid the "Purchased Amount." For example, Defendants received one customer complaint stating: "My loan payoff was met and exceeded . . . [by] 4 daily payments totaling in the amount of $3480." Defendants explained to another customer who complained about excess, unauthorized debits that "there is a 4 day lag on ACH debits . . . it's simply the way our processor works."

31.     In both internal communications and communications with customers in response to complaints, Defendants' employees and agents have repeatedly acknowledged that the "lag" or "debit delay" was common practice for Defendants. For example, in response to a customer complaint about such overpayments, Defendants' Operations Manager wrote to one of Defendants' in-house servicers: "Maybe send an account summary so [the customer] understands the 5 day debit delay?" When another customer questioned these overpayments during a telephone call, one of Defendants' in-house servicers responded that "there is *always* a delay" (emphasis added) in the prompt cessation of daily withdrawals. In response to another

customer who noticed and complained after the first day of overpayment, one of Defendants' servicers responded that he "made an exception" for the customer by stopping ACH debits before the full 4-5 days of overpayments elapsed.

32.     Additionally, in numerous instances, Defendants' unauthorized payments have exceeded the 4-5 days associated with their typical "lag" or "debit delay."  For example, one customer submitted a complaint stating that Defendants continued making ACH debits from his account "for another two weeks and only stopped after numerous calls," resulting in an overpayment of $4,345.00.  Another customer reported that "[a]ccording to our contract which we have, we would pay back $10,213.00. . . . Yellowstone has withdrawn $5,409 over the amount we owed them."

33.     Beyond the unauthorized payments themselves, in some instances, customers incur additional monetary and other harm, including overdraft fees charged by customers' banks because their accounts were drained of funds by Defendants' unauthorized withdrawals.  For example, one customer wrote to Defendants that she "ha[d] $140 in overdraft fees that would not have happened if [Defendants] would of [*sic*] stopped withdrawing on Monday when I called to confirm it was the last payment …. I'm still overdrawn and need it desperately."  When another customer complained to Defendants about overpayments taken from her, and resulting bank overdraft fees, one of Defendants' in-house servicers told his employee "if she busts your balls again and doesn't stop – u can use ur judgment and throw her the $100 to go away," and Defendants' Operations Manager stated "I think it's money well spent if you don't have to talk to her."

34.     To the extent Defendants refund these unauthorized debits, in numerous instances, they do so only in response to complaints from customers.  In fact, even after customers

complain to Defendants about these unauthorized withdrawals, Defendants sometimes take weeks or months to refund these payments to customers.

35.     As indicated above, customers each typically pay hundreds (and sometimes thousands) of dollars in these excess, unauthorized payments.  Defendants have charged at least millions of dollars in unauthorized overpayments.

36.     Defendants Stern and Reece have closely overseen and managed Defendants' servicing and collection of payments from consumers.  They have directly supervised their in-house servicers and disseminated relevant policies and practices to them.  Additionally, Defendants Stern and Reece have known about, and communicated with their in-house servicers about, the existence of unauthorized overpayments by consumers.

37.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## **VIOLATIONS OF THE FTC ACT**

38.      Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

39.      Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

40.      Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### **Count I**

### **Misrepresentations Regarding
Collateral and Personal Guarantees**

41.      In numerous instances in connection with the advertising, marketing, promotion, or offering of small business financing products, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants:

    a.   require no collateral; and

    b.   require no personal guarantee from business owners.

42.      In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 41, such representations were false or misleading at the time Defendants made them.

43.      Therefore, Defendants' representations as set forth in Paragraph 41 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

### Misrepresentations Regarding Financing Amount

44.     In numerous instances in connection with the advertising, marketing, promotion, or offering of small business financing products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers will receive a specific amount of financing.

45.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 44, such representations were false or misleading at the time Defendants made them.

46.     Therefore, Defendants' representations as set forth in Paragraph 44 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III

### Unfair Unauthorized Withdrawals

47.     In numerous instances, Defendants have withdrawn money from consumers' bank accounts in amounts in excess of consumers' authorization without the express informed consent of consumers.

48.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

49.     Therefore, Defendants' practices as described in Paragraph 47 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## CONSUMER INJURY

50.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

51.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated:  August 3, 2020                    Respectfully submitted,

                                          ALDEN F. ABBOTT
                                          General Counsel

                                           /s/  *Christopher B. Leach*
                                          EVAN R. ZULLOW
                                          (ezullow@ftc.gov)
                                          THOMAS C. KOST
                                          (tkost@ftc.gov)
                                          CHRISTOPHER B. LEACH
                                          (cleach@ftc.gov)
                                          IOANA R. GORECKI
                                          (igorecki@ftc.gov)
                                          Federal Trade Commission
                                          600 Pennsylvania Ave. NW
                                          Mail Stop CC-10232
                                          Washington, DC 20580
                                          Tel: 202-326-2914 (Zullow);
                                          202-326-2286 (Kost);
                                          202-326-2394 (Leach);
                                          202-326-2077 (Gorecki)
                                          Fax: 202-326-2752

                                          Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION